UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STATE OF INDIANA EX REL ROKITA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01665-MPB-MKK |
| | ) | |
| INDIANA UNIVERSITY HEALTH, INC., | ) | |
| INDIANA UNIVERSITY HEALTHCARE | ) | |
| ASSOCIATES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION TO DISMISS**

Plaintiff State of Indiana *ex rel*. Todd Rokita (the "State") initiated this lawsuit against Indiana University Health, Inc., and Indiana University Healthcare Associates, Inc. d/b/a/ IU Health Physicians (collectively "IUH") pursuant to the Health Information Technology for Economic and Clinical Health Act ("HITECH"), alleging that IUH violated the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320-d(5), and the Indiana Deceptive Consumer Sales Act ("DCSA"), Ind. Code § 24-5-0.5-1 *et. seq*. IUH has filed a Motion to Dismiss the State's Complaint in its entirety. (Docket No. 16). For the reasons that follow, IUH's Motion to Dismiss is **GRANTED**.

## I.    Background

For purposes of reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts alleged in the complaint and draws all reasonable inferences in the State's favor. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.").

Defendant IUH operates medical facilities throughout Indiana and is Indiana's largest health network, with an over 36,000-member workforce and 100,000 admissions per year.

(Docket No. 1, Compl. at ECF p. 5). A majority of IUH's patients reside in Indiana. (*Id*.). On June 27, 2022, IUH physician Dr. Caitlin Bernard, M.D., ("Dr. Bernard") received a referral from an Ohio physician to terminate a ten-year-old Ohio patient rape victim's pregnancy. (*Id*. at ECF p. 8). The referral came on the heels of an Ohio abortion ban. (*Id*. at ECF p. 10). On June 29, 2022, the Ohio patient and her mother checked into an Indiana hospital operated by IUH. (*Id*. at ECF p. 8).

Under Indiana law, a physician who performs an abortion procedure is required to submit a Termination of Pregnancy Report to the Indiana Department of Health. (*Id*.). Dr. Bernard knew that these reports were made available to the public pursuant to Indiana's Access to Public Record Act. (*Id*.). According to the State, Dr. Bernard "knew or should have known that any disclosure of information related to the 10-year-old patient could generate public interest that could result in additional requests to obtain copies of the redacted Termination of Pregnancy Report related to the 10-year-old patient." (*Id*.). During the intake process on June 29, 2022, IUH did not document whether the patient or her mother received a copy of the patient privacy notice. (*Id*.). Neither the patient nor her mother authorized IUH to speak to the media about the Ohio patient's case. (*Id*.).

Later that day, Dr. Bernard attended a public rally that she helped organize on Indiana University School of Medicine's campus. (*Id*.). Dr. Bernard helped lead the rally and carried a bullhorn, from which she initiated chants and acted as one of the event's speakers. (*Id*.). During the rally, Dr. Bernard discussed the Ohio patient's case with a fellow physician. (*Id*. at ECF p. 9). This conversation bore no relation to treatment, payment, or operations. (*Id*.). A reporter for the *Indianapolis Star* overheard the conversation. (*Id*.). When the conversation concluded, the reporter approached Dr. Bernard to confirm the information she overheard. (*Id*. at ECF p. 9). Dr.

Bernard disclosed to the reporter, (1) that she received a referral from Ohio doctor concerning a patient who was six weeks and three days pregnant, (2) the patient was ten years old, (3) the patient traveled to Indiana to be treated, (4) the patient sought an abortion procedure, (5) the patient was a victim of rape, and (6) she treated the patient the week of June 27. (*Id*. at ECF pp. 9–10).

On June 30, 2022, the Ohio patient was admitted to an IUH facility for an overnight stay to conduct the abortion. (*Id*. at ECF p. 10). That next morning, while still checked into the hospital, the *Indianapolis Star* published an article describing the Ohio patient's case. (*Id*.). Soon after the article was published, national outlets picked up the story, President Biden referenced the incident in a speech, and media outlets made requests to the Indiana Department of Health to obtain copies of the Termination of Pregnancy Report. (*Id*. at ECF pp. 10–11).

The *Indianapolis Star* article was referred to Lauren Cislak, the Vice President of Corporation Communications, Public Relations, and Social Media, at IUH as a potential HIPAA violation. (*Id*. at ECF p. 11). Ms. Cislak, in turn, referred the story to the IUH Privacy Office. (*Id*.). The incident was referred to IUH investigator, Melissa Cockrum. (*Id*.). The Ohio patient was designated as a "high profile patient" and Ms. Cockrum placed a "Sensitivity Alert" on the patient's electronic medical records to limit the public's access to her medical records. (*Id*.).

IUH prepared a "Risk Assessment" review to determine whether a notice of data breach was required. (*Id*. at ECF p. 12). The Risk Assessment identified the *Indianapolis Star* as, "[t]he unauthorized person who used the protected health information or to whom the disclosure was made." (*Id*.). IUH's definition of Personally Identifiable Information ("PII") incorporates "all elements of dates." (*Id*.). The Risk Assessment ultimately concluded that the disclosure to an unauthorized person did not constitute a breach necessitating notification. (*Id*.).

3

Members of the Data Privacy Section of the Indiana Attorney General reached out to IUH to schedule a meeting regarding the internal HIPAA investigation of Dr. Bernard. (*Id*.). The next morning, on July 15, 2022, IUH issued the following press release, which they sent to multiple media outlets:

> As part of IU Health's commitment to patient privacy and compliance with privacy laws, IU Health routinely initiates reviews, including the matters in the news concerning Dr. Caitlin Bernard. Pursuant to its policy, IU Health conducted an investigation with the full cooperation of Dr. Bernard and other IU Health team members. IU Health's investigation found Dr. Bernard in compliance with privacy laws.

(*Id*. at ECF p. 13). During a November 2022 hearing in a related lawsuit in state court, Dr. Bernard and her attorney submitted an exhibit that contained a portion of the Ohio patient's medical records. (*Id*. at ECF p. 19). There was no court order authorizing disclosure. (*Id*.). Dr. Bernard testified at the hearing that her conduct complied with both HIPAA and Indiana's Patient Privacy law. (*Id*. at ECF p. 20).

On May 25, 2023, the Indiana Medical Licensing Board concluded that Dr. Bernard's conversation with her colleague and the *Indianapolis Star* reported violated HIPAA. The Board found that Dr. Bernard's disclosures to her colleague and the reporter violated HIPAA, that she failed to properly de-identify the Ohio patient's information, and that the disclosure violated Indiana's rule on patient confidentiality. (*Id*. at ECF p. 20). The Board issued Dr. Bernard a Letter of Reprimand. (*Id*.). The next day, IUH issued a press release which stated:

> We appreciate the Medical Licensing Board's time dedicated to understanding the issues involving our colleague Dr. Caitlin Bernard. We are pleased she will continue to be a member of our medical team and provide compassionate care to her patients. We do not agree with the Board's decision regarding patient privacy regulations and stand by the HIPAA risk assessment. We believe Dr. Bernard was compliant with privacy laws.

(*Id*. ECF pp. 20–21). Following the Licensing Board's hearing, the State identified instances where IUH had "sanctioned non-physician employees with termination for far less egregious

patient privacy violations, but [] failed to implement or enforce similar privacy policies or sanctions for its physicians." (*Id*. at ECF p. 21).

On September 15, 2023, the State filed the present action against IUH, alleging claims under HIPAA and the DCSA, and requesting relief in the form of an injunction, damages, attorney's fees, and costs pursuant to § 1320-d(5), and award remedies as permitted by Ind. Code § 24-5-0.5-4. (*Id*. at ECF pp. 26–27).

## II.     Legal Standard

Federal Rule of Civil Procedure Rule 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Gibson v. City of Chi*., 910 F.2d 1510, 1520 (7th Cir. 1990) (quoting *Triad Assocs., Inc. v. Chicago Hous. Authority*, 892 F.2d 583, 586 (7th Cir.1989)).

A plaintiff's complaint must contain "a short and plain statement showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy this standard, a plaintiff need not include "detailed factual allegations," rather, a plaintiff must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 570 (2007). A claim is facially plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## III.    Discussion

### A.  HITECH and HIPAA Claims

At issue are the parameters of the State's statutory authority under HITECH to bring this suit. HITECH provides that—

5

> Except as provided in subsection (b), in any case in which the attorney general of a State has reason to believe that an interest of one or more of the residents of that State has been or is threatened or adversely affected by any person who violates a provision of this part, the attorney general of the State, as parens patriae, may bring a civil action on behalf of such residents of the State in a district court of the United States of appropriate jurisdiction—(A) to enjoin further such violation by the defendant; or (B) to obtain damages on behalf of such residents of the State, in an amount equal to the amount determined under paragraph (2).

42 U.S.C. § 1320-d(5). According to IUH, because the case is based on alleged HIPAA violations solely concerning an Ohio resident, the State lacks statutory authority to pursue its federal claims. There is no doubt that suit by the State on behalf of the Ohio patient would exceed Congress's grant of authority to state attorneys' generals to represent *their own* residents. § 1320-d(5) ("[T]he attorney general of a State . . . may bring a civil action on behalf of *such residents of the State . . . .*") (emphasis added). To the extent that the State brings its claim on behalf of the Ohio resident, it fails to properly invoke *parens patriae* authority.

In response, however, the State argues that the interests of Indiana residents are at stake—the privacy interests of all IUH patients, and the interests of all IUH employees in seeking to avoid criminal or civil prosecution for their own HIPAA violations. As such, the State couches its claims as not on behalf of the Ohio patient alone, but also "on behalf of the residents of Indiana and their interests in the protection of their personal health information and their interests in complying with federal privacy laws." (Docket No. 17, Pl.'s Br. at ECF p. 10). Implicit in the State's argument is an interpretation of the term "interest," and phrase, "threatened or adversely affected" broad enough to support its vaguely conceived cause of action. The issue before the Court, thus, is one of statutory interpretation.

Statutory interpretation is a "holistic endeavor," *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd*., 484 U.S. 365, 372 (1988), which "begins with the text," but does

6

not end there. *Ross v. Black*, 578 U.S. 632, 638 (2016). Courts are encouraged to look at the structure of the statute as "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809 (1989). The first step of statutory interpretation is to determine "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 648-49 (7th Cir. 2011), *aff'd sub nom. RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 132 (2012) (internal quotation marks omitted) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).

### 1. "Interest"

With no definition available within HIPAA's statutory scheme, the State proposes a sweeping definition of "interest" detached from any context. In support of its interpretative framework, the State argues that its authority "does not specifically rely upon Indiana residents' *privacy rights* being or having been adversely affected or threatened, as suggested by [IUH]," but rather, that "HITECH grants [the State] statutory authority to bring its claims under HIPAA for *any interest* of Indiana residents which has been or is adversely affected or threatened." (Docket No. 23, Pl.'s Br. at ECF pp. 9–10) (emphasis in original).

In fact, HITECH authorizes the State to bring suit when there is reason to believe that "*an* interest," not "*any* interest," of Indiana residents' has been threatened or adversely affected. § 1320d-5(d)(1) (emphasis added). The misstatement is significant. While "the indefinite article 'an' generally implies the possibility of a larger number than just one," *United States v. Hagler*, 700 F.3d 1091, 1098 (7th Cir. 2012), "any," in this context, could suggest an "unmeasured or unlimited [] amount, number, or extent." *Any*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/any (last visited May 30, 2024).

Moreover, the term "interest" must not be interpreted in a vacuum. Rather, the Court's interpretation should consider HIPAA's "structure, history, and purpose." *Maracich v. Spears*, 570 U.S 48, 76 (2013). "HIPAA was designed to improve the efficiency and effectiveness of the health care system by promoting the electronic exchange of health information for administrative and financial health care transactions, such as submitting claims for treatment provided, or determining insurance eligibility." *Hippa Privacy Rule*, Testimony Before the Subcomm. on House Energy & Com. of the H. Comm. on Oversight and Investigations, 2013 WL 1782847 (statement of Leon Rodriguez, Director, Office for Civil Rights). To ensure "strict privacy protection for health information," Congress "authorized the Department of Health and Human Services to promulgate regulations, which [are] . . . collectively [known] as the Privacy Rule." Deborah F. Buckman, *Validity, Construction, and Application of Health Insurance Portability and Accountability Act of 1996 (HIPAA) and Regulations Promulgated Thereunder*, 194 A.L.R. Fed. 133 (2004). The HIPAA Privacy Rule "carefully balances *individual privacy interests* with important public priorities." 2013 WL 1782847 (emphasis added). To reach this balance, the Privacy Rule establishes standards for disclosing health information by requiring covered entities to have "safeguards in place to ensure the privacy of individuals' identifiable health information." *Id*. In 2010, Congress passed HITECH, which " in addition to accelerating the adoption of health information technology, also strengthened and expanded HIPAA's privacy and security requirements." *Id*.

Safeguarding an individual patient's health information is the driving force behind HIPAA. *See River Rd. Hotel Partners, LLC*, 651 F.3d at 649 ("When interpreting statutory language, the meaning attributed to a phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities

that inform the analysis."). Tying the privacy interests protected by HIPAA back to the language of HITECH, the text extends a cause of action where the attorney general of a state has reason to believe that at least one of its resident's *privacy interests* "has been or is threatened or adversely affected by any person" in violation of HIPAA. § 1320d-5(d)(1).

Here, without citation or support for its argument, the State frames all Indiana patients and IUH employees as having protected "interest[s]." § 1320d-5(d)(1). The Court is unconvinced that that the "interest[s]" Congress contemplated when enacting HIPAA were that of provider employees seeking to avoid civil and criminal liability for possible HIPAA violations. § 1320d-5(d)(1). IUH asserts, and the Court agrees, that, "HIPAA protects patients' *privacy interests*, not employees' interests in avoiding the liability HIPAA itself creates." (Docket No. 25, Def.'s Reply at ECF p. 4) (emphasis added). In enacting HIPAA, congressional concern was twofold—to promote the electronic exchange of health information and protect patients' privacy rights in the process. The State has not demonstrated that the "interest[s]" of Indiana residents and IUH employees' in avoiding liability are among the interests that HITECH contemplates, and HIPAA protects. The State, therefore, cannot invoke its *parens patriae* authority based on an "interest" that HIPAA does not encompass.

### 2. "Threatened or Adversely Affected"

The Court next considers the phrase "threatened or adversely affected" within the statute. § 1320d-5(d)(1). The State advances an interpretation of "threatened or adversely affected" that is not only broad, but novel. In the absence of cognizable harm to any Indiana residents, the State argues that IUH's conduct affecting the Ohio resident gives rise to the reasonable belief that the medical privacy interests of all Indiana residents are threatened. It is worth noting that the parties

do not cite, and the Court cannot find, any other HIPAA lawsuit brought by a state where no resident has been directly affected by or is the subject of the alleged HIPAA violation at issue.

HITECH does not explicitly define what it means for a resident's interests to be "threatened" or "adversely affected." § 1320d-5(d)(1). Thus, the Court begins, as it must, with the plain and ordinary meaning of the terms. *Lara–Ruiz v. Immigration and Naturalization Service*, 241 F.3d 934, 940 (7th Cir. 2001). A term's ordinary meaning must be informed by context and its overall statutory scheme. *Reno v. Koray*, 515 U.S. 50, 56 (1995) ("[I]t is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.'"); *see Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 321 (2014) ("[R]easonable statutory interpretation must account for both the specific context in which . . . language is used and the broader context of the statute as a whole.") (internal quotation omitted)).

The Supreme Court has many times instructed that "[s]tatutes must be read as a whole." *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 135 (2007) (internal citation omitted). Zooming out from the disputed language, the Court finds significant Congress's explicit authorization for individual states attorneys general to bring suit on behalf of their residents "*as parens patriae*." § 1320d-5(d)(1) (emphasis added). By incorporating this common law term into HITECH, the Court presumes that Congress intended for that term to maintain its established meaning. *See Nationwide Mut. Ins. v. Darden*, 503 U.S. 318, 322 (1992) ("Where Congress uses terms that have accumulated settled meaning under . . . the common law, *a court must infer*, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of th[o]se terms") (internal citations omitted) (emphasis added); *see also Sekhar v. United States*, 570 U.S. 729, 732 (2013) ("It is a settled principle of interpretation that, absent other indication, Congress

10

intends to incorporate the well-settled meaning of the common-law terms it uses.") (internal quotations omitted).

*Parens patriae*, or "parent of the country," is an Article III doctrine which allows standing to be conferred upon a state if that state articulates a "quasi-sovereign interest" apart from the interests of private residents. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 593 (1982). A quasi-sovereign interest consists of a set of interests that the State has "in the health and well-being, both physical and economic, of its residents in general . . . [and also] in not being discriminatorily denied its rightful status within the federal system." *Id*. at 593. A fully sovereign interest, in contrast with a quasi-sovereign interest, allows a state to exercise "sovereign power over individuals and entities within the relevant jurisdiction—[which] involves the power to create and enforce a legal code . . . [and] demand . . . recognition from other sovereigns." *Id*. at 601. The sovereign interest in enforcing HIPAA belongs to the United States, not the individual states. *Cf. Utah Div. of Consumer Prot. v. Stevens*, 398 F. Supp. 3d 1139, 1145 (D. Utah 2019) (construing *parens patriae* authority under nearly identical language). Thus, that Congress elected for states to bring suits "as *parens patriae*" places inherent limitations on a state's authority to prosecute HIPAA violations. Unlike under HHS or the Office for Civil Rights ("OCR"), individual states attorneys general do not possess general enforcement authority pursuant to a sovereign interest in "enforc[ing] [the] legal code." *Alfred L. Snapp & Son, Inc*., 458 U.S. at 601; *see also Stevens*, 398 F. Supp. 3d at 1149 (noting the limitations to a state attorneys general proceeding in *parens patriae*).[1]

---

[1] The Telemarketing Act states that "[w]henever an attorney general of any State has reason to believe that the interests of the residents of that State have been or are being threatened or adversely affected because any person has engaged or is engaging in a pattern or practice of telemarketing which violates any rule of the Commission under section 6102 of this title, the State, as *parens patriae*, may bring a civil action on behalf of its residents in an appropriate

Consequently, state attorneys general cannot bring suit based on a bare violation of HIPAA, rather, their authority to bring suit is triggered *if* the attorney general has reason to believe that an interest of "the residents of that State *has been or is threatened or adversely affected*." § 1320d-5(d)(1) (emphasis added). Moreover, the text dictates that such interests be "threatened or adversely affected *by any person who violates a provision of this part*," thereby creating an invisible string tying the "threatened or adversely affected" resident's interest to a corresponding "violation" of HIPAA. § 1320d-5(d)(1). Synthesizing these conditions, there can be no *parens patriae* action by a state attorneys general in the absence of a resident's privacy interest having been or currently being "threatened or adversely affected" by a defendant's illegal conduct. *Id*. Identifying this inherent limitation on *parens patriae* suits allows the Court to distinguish general enforcement authority from *parens patriae* authority, which in turn aids the Court in rejecting interpretations of "threatened or adversely affected" that would afford states greater authority than contemplated by HITECH.

That Congress settled on the phrase "threatened or adversely affected" when enacting HITECH is not coincidental. This exact phrase can be found throughout the United States Code where, as here, Congress authorizes states attorneys general to sue on behalf of their residents. *See* 12 U.S.C. § 5538(b)(1) (unfair or deceptive acts or practices regarding mortgage loans); 15 U.S.C. § 45c(c)(1) (unfair and deceptive acts and practices relating to circumvention of ticket access control measures); 15 U.S.C. § 45b(e)(1) (regulating form contracts that impede consumer

---

district court of the United States." 15 U.S.C. § 6103(a). In *Stevens*, the Utah District Court contrasted the FTC and CFPB's broad authority to enforce the Telemarketing Act with the individual state's more limited enforcement authority. 398 F. Supp. 3d at 1149. The court noted "[t]here is no requirement that the FTC or the CFPB sue on behalf of residents or consumers, no language indicating that these agencies sue '*parens patriae*,' and no mandate that they have 'reason to believe that the interests of the residents of [the United States] have been or are being threatened or adversely affected' before bringing suit." *Id*.

reviews); 15 U.S.C. § 6103(a) (deceptive telemarketing acts or practices); 15 U.S.C. § 6504(a)(1) (unfair and deceptive practices in connection with collection and use of personal information from children); 15 U.S.C. § 7706(f)(1) (protections for users of commercial electronic mail); 49 U.S.C. § 14711(a) (consumer protection of household goods by a household goods motor carrier).

Variations of the terms "threatened" and "adversely affected" also surface throughout decades of the Supreme Court's non-statutory *parens patriae* decisions, exploring the parameters of a state's ability to sue. *Missouri v. Illinois*, 180 U.S. 208, 212 (1901) ("But it must surely be conceded that, if the health and comfort of the inhabitants of a state *are threatened*, the state is the proper party to represent and defend them.") (emphasis added); *Kansas v. Colorado*, 185 U.S. 125, 145–46 (1902) ("[T]he gravamen of the bill is that the state of Colorado . . . is depriving *and threatening to deprive* the state of Kansas and its inhabitants of all the water heretofore accustomed to flow in the Arkansas river.") (emphasis added); *North Dakota v. Minnesota,* 263 U.S. 365, 375–76 (1923) (acknowledging "[t]he right of a state as *parens patriae* to bring suit to protect the general comfort, health, or property rights of its inhabitants *threatened by* the proposed or continued action of another state") (emphasis added); *Pennsylvania v. West Virginia,* 262 U.S. 553, 591, *aff'd sub nom. Pennsylvania v. West Virginia*, 263 U.S. 350, (1923) ("Each [plaintiff] sues to protect a twofold interest—one as . . . and the other as the representative of the consuming public whose supply will be *similarly affected*. Both interests are substantial and both the *threatened with serious injury*.") (emphasis added); *North Dakota v. Minnesota*, 263 U.S. 365, 375–76 (1923) (stating that "[t]he right of a state as *parens patriae* to bring suit to protect the general comfort, health, or property rights of its inhabitants *threatened by* the proposed or continued action of another state" should be differentiated from a state's sovereign power)

13

(emphasis added); *Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923) (finding that Massachusetts identified no quasi sovereign interests "*actually invaded or threatened*") (emphasis added); *Maryland v. Louisiana,* 451 U.S. 725, 738 (1981) "But it [the state] may act as the representative of its citizens in original actions where the injury alleged *affects the general population* of a State in a substantial way.") (emphasis added).

The Supreme Court's *parens patriae* precedent broadly establishes two lines of cases. The first involves a defendant's alleged conduct resulting in a cognizable harm to residents' interests. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 597 (discrimination claim on behalf of Puerto Rican workers after 2,318 job opening were transmitted to Puerto Rico, 992 Puerto Ricans actually arrived on the mainland, 420 came to Virginia, and fewer than 30 had employment three weeks later). There does not seem to be a dispute between the parties that in instances where a cognizable harm has come to fruition, residents' interests can be said to have been "adversely affected." § 1320d-5(d)(1). Here, the State argues that the only Indiana resident who has been "adversely affected" is Dr. Bernard. (Pl.'s Br. at ECF p. 13). However, the State based this assertion on Dr. Bernard's interest in being adequately trained so as to avoid civil and criminal liability, an argument the Court has previously rejected.

Second, the Supreme Court has confirmed a state's right to act as *parens patriae* where cognizable harm is threatened but has not yet occurred. *See Missouri v. Illinois,* 180 U.S. at 212 (Missouri residents' interests were threatened by an Illinois law, recently passed but not yet in effect, that would discharge sewage into the Mississippi river). In *Hawaii v. Standard Oil Company of California*, the Supreme Court confirmed "the right of a State to sue as parens patriae to *prevent* or *repair* harm to its 'quasisovereign' interests." 405 U.S. 251, 258 (1972) (emphasis added). The latter line of cases, where a state is attempting to prevent harm, is

particularly relevant here as the State's argument centers on an active threat to Indiana patients'
privacy interests. (Compl. at ECF pp. 23–24); (Pl.'s Br. at ECF pp. 2, 3, 4, 9, 10, 11, 12)
("Defendants' subsequent actions concerning Dr. Bernard's unauthorized disclosures and
violation of a patient's privacy interest, give the Attorney General a reasonable belief that the
medical privacy interests of the residents of Indiana *are threatened*.").

In construing the term "threatened," the Court draws particularly from three Supreme
Court cases. In *Pennsylvania v. West Virginia*, 262 U.S. at 553, Pennsylvania sought an
injunction against West Virginia based on a recently enacted law that would "largely curtail or
cut off the supply of natural gas" from West Virginia to Pennsylvania. *Id*. at 581. In its complaint,
Pennsylvania argued that its residents were threatened because the law was "about to be carried
into effect by [the state's] officers acting in her name and at her command" and was "likely to be
productive of great injury." *Id*. at 591. Based on these allegations, the Court "recognized
[Pennsylvania] as a proper party to represent the interests of its residents in maintaining access to
natural gas produced in West Virginia." *Alfred L. Snapp & Son, Inc*., 458 U.S. at 605.

The *parens patriae* suit in *Missouri v. Illinois*, 180 U.S. at 208, similarly concerned
recently passed legislation that created an impending injury to residents' interests. 180 U.S. at
212. There, Missouri challenged an Illinois law that would authorize sewage to be admitted into
the Mississippi river in Missouri. *Id*. at 214. The Court observed that "*if* the health and comfort
of the inhabitants of a state *are threatened*, the state is the proper party to represent and defend
them." *Id*. at 241. (emphasis added). In concluding that the State of Missouri had *parens patriae*
authority, the Court reasoned that, "[t]he health and comfort of the large communities inhabiting
those parts of the state situated on the Mississippi river are not alone concerned, but contagious
and typhoidal diseases introduced in the river communities may spread themselves throughout

15

the territory of the state." *Id*. In a later case, the Supreme Court again affirmed Missouri's interest

in preventing "graphic and direct" threats to public health and comfort of its residents. *Alfred L.*

*Snapp & Son, Inc*., 458 U.S. at 604.

Last, in *Georgia v. Pennsylvania Railroad Co.* 324 U.S. 439, 439 (1945), Georgia sought

injunctive relief after "some 20 railroads had conspired to fix freight rates in a manner that

discriminated against Georgia shippers in violation of federal antitrust laws." *Alfred L. Snapp &*

*Son, Inc*., 458 U.S. at 606. Specifically, the complaint detailed that:

> [S]ome sixty rate bureaus, committees, conferences, associations and other private
> rate-fixing agencies have been utilized by defendants to fix the[] rates . . . that no
> road can change joint through rates without the approval of these private agencies
> . . . [and] the rates so fixed are approximately 39 per cent higher than the rates and
> charges for transportation of like commodities for like distances between points in
> the North.

*Pennsylvania R. Co*., 324 U.S. at 443. The Court described such ratemaking as a "continuous

process" for which Georgia was seeking declaratory relief that "[would] prevent in the future the

kind of harmful conduct [that] ha[d] occurred in the past." *Id*. at 461. Based on these allegations,

the Court concluded that "[t]he threatened injury [was] clear" and "[t]he damage alleged [was]

sufficient to satisfy the preliminary requirements of th[e] motion to file" a complaint. *Id*. at 462.

The above cases demonstrate that residents' interests are "threatened" where there is

identifiable, impending harm to residents' interest that will take root absent the court's

intervention. In each case, the plaintiff-state provided specific factual allegations to demonstrate

a causal relationship between the anticipated or ongoing injury to residents' interests and the

defendant's alleged conduct. Here, the State asks the Court to wade into unchartered territory to

determine whether a suit can be brought where there has been no tangible effect on a resident's

privacy interests. While no such case has previously been brought, the Court does not read

"threatened," as requiring that a state identify an affected resident as a condition precedent to

bringing suit. To construe HITECH so narrowly would necessarily erase Congress inclusion of the term "threatened." § 1320d-5(d)(1). Practically speaking, deficiencies in a covered entities' HIPAA policies, for example, ordinarily come to light following an event, such as a security or data breach, where residents' medical information has been accessed. In instances like these, it is clear that residents' privacy interests have been or are "threatened or adversely affected." § 1320d-5(d)(1). Previous HIPAA enforcement actions brought by the State are instructive on this point. *See* Complaint, *State of Indiana ex. Rel. Rokita v. DXC Tech. Serv., Inc.*, No. 1:20-cv-1616, 2020 WL 3891642 (S.D. Ind. June 12, 2020) (alleging that 471 records, representing 39,984 individual members were accessed by an unauthorized user and that affected Indiana residents were notified by mail); Complaint, *State of Indiana ex. rel. Rokita v. Jackson Cnty. Schneck Mem'l Hosp.*, No. 4:23-cv-155, 2023 WL 6677119 (S.D. Ind. Sept. 6, 2023) (alleging that data breach exposed the personal information or PHI of approximately 89,707 Indiana residents); Complaint for Injunctive Relief, Damages, Attorneys Fees and Costs, *State of Indiana Ex. Rel Rokita v. Carepointe, P.C.*, 2:23-cv-328, 2023 WL 8584895 (N.D. Ind. Sept. 29, 2023) (alleging that deficient security practices resulted in disclosure of PHI of approximately 45,002 Indiana residents); Amended Complaint, *Arizona et al. v. Med. Informatics Eng'g*, 3:18-CV-969, 2019 WL 2363608 (N.D. Ind. May 23, 2019) (alleging that hackers stole the PHI of 3.9 million individuals, which included Indiana residents).

The foregoing cases are prime examples of instances where the defendant's conduct "actually invaded" or "adversely affected" Indiana residents' privacy interests. *See Mellon*, 262 U.S. at 485; § 1320d-5(d)(1). However, HITECH clearly contemplates an alternative, that the attorney general may bring suit when they have reason to believe that at least one resident's privacy interests are "threatened." § 1320d-5(d)(1) ("threatened *or* adversely affected")

(emphasis added). In both *Pennsylvania v. West Virginia* and *Missouri v. Illinois*, no specific resident had been affected by the defendant's allegedly illegal conduct. The purpose of both suits was to prevent impending injury, which was both "graphic and direct," to resident's public health interests. *Alfred L. Snapp & Son, Inc*, 458 U.S. at 593. Consequently, that a state cannot identify an affected private resident at the outset does not appear dispositive. It is conceivable that an attorney general could bring suit, pursuant to its authority under HITECH, if they have reason to believe that their residents' privacy interests are actively threatened by a defendant's conduct, even if that conduct has not yet harmed the state's residents.[2] Caution is necessary here, though. The attorney general must allege sufficient facts to support that an impending threat, or ongoing threat, to residents' privacy interests in fact exists. Reliance on conclusory allegations will not only result in failure to invoke *parens patriae* authority, but also risks running afoul of Article III's limitations. Congress is well aware that it may not legislate around Article III. Thus, an interpretation of "threatened" that would permit state attorneys general to sue for violations based on speculative or attenuated "threatened" injuries is a patently unreasonable reading of the statute.

The State's allegations track Dr. Bernard's alleged unauthorized disclosures to her colleague, an *Indianapolis Star* reporter, and during a court proceeding, as well as IUH's

---

[2] In Utah Div. of Consumer Prot. v. Stevens, the State sued Real Estate Workshop ("REW") alleging violations of federal and state laws governing telemarketing and other business activities. 398 F. Supp. 3d at 1141. In support of its suit, the State argued that it was "seek[ing] to protect the interests of Utah consumers who may purchase REW products and services in the future. Given that the State neither alleges that any Utah consumers have purchased products or services from REW nor disputes Defendants' representation that it has no past or current Utah customers, the court finds this threat of injury to Utah citizens too speculative and remote to support *parens patriae* standing." *Id*. at 1147 n.3. In contrast with Stevens, where the defendant had no presence in the state, IUH is Indiana's largest health network and the "vast majority" of its patients are Indiana residents. (Compl. at ECF p. 5).

subsequent press releases. (Comp. at ECF pp. 10–13, 19–20). In support of its argument that Indiana residents' privacy interests are threatened, the State (1) advances a pattern or practice theory of liability, (2) argues that IUH's policies, or lack thereof, do not safeguard Indiana residents' PHI, and (3) argues that Indiana residents' privacy interests are threatened by IUH's failure to train its workforce.

### a.  Pattern or Practice

The Court can quickly dispense with the State's argument that by failing to "properly investigate the occurrence [of an alleged HIPAA violation] and take the required steps thereafter," IUH has "threatened" the privacy interests of all Indiana patients. (Def.'s Br. at ECF p. 10).[3] Even if it is true that IUH failed to properly investigate and respond to Dr. Bernard's alleged violations of HIPAA, its conduct still only implicates the privacy interests of one patient, an Ohio resident. To implicate the privacy interests of all Indiana patients, the State attempts to fashion a pattern or practice theory of liability in which IUH's conduct as to one patient is reflective of IUH's systemic failure to comply with HIPAA. Generally, the "systemic pattern or practice" theory emerges in the employment discrimination context where the focus is not "on individual hiring decisions, but on a pattern of discriminatory decisionmaking." *Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 876 (1984). *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 n.16 (1977) ("[S]ingle, insignificant, isolated acts of discrimination by a single business would not justify a finding of a pattern or practice").

---

[3] In enacting 15 U.S.C. § 6103(a), Congress authorized parens patriae suits pursuant to a pattern or practice theory of liability. *Id.* ("A state attorney general may bring suit where residents' interests "are being threatened or adversely affected *because any person has engaged or is engaging in a pattern or practice* of telemarketing which violates any rule of the Commission.") (emphasis added). No similar language is found in § 1320-d(5).

The State cannot manufacture a pattern or practice theory of liability to sidestep HITECH's requirement that at least one resident "of *that* State" must be "threatened or adversely affected." § 1320-d(5) (emphasis added). This Court draws only "*reasonable inferences*" in the State's favor. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co*., 811 F.2d 326, 329 (7th Cir. 1987) (emphasis added). Even if IUH was incorrect and Dr. Bernard did violate HIPAA, it is not reasonable to infer that the mistakes IUH made are reflective of its standard operating procedure instead of an individual miscalculation based on the specific facts of this case. This is particularly true where, as here, the State has offered no other facts to support that IUH has established a pattern of failing to investigate HIPAA violations, failing to document unauthorized disclosures, failing to notify its patients of breaches, and failing to sanction its employees for their HIPAA violations. Without the benefit of such inferences, there are no facts demonstrating that IUH is about to act, *cf. Missouri,* 180 U.S. at 212, or has acted, and *will continue to act*, in a way that threatens Indiana patients' privacy residents. *Cf. Georgia*, 324 U.S. at 461. Rather, its allegations illustrate only the reasonable belief that IUH's conduct adversely affected an out-of-state resident whose interests the State is not authorized to represent.

**b.  Failure to Enact or Enforce Policy**

The State also argues that Indiana residents' privacy interests are under threat due to IUH's "failure to enact or enforce appropriate policies and safeguards to protect PHI." (Def.'s Br. at ECF p. 3). Here, the State has assumed that because IUH determined that Dr. Bernard's conduct complied with HIPAA, it must have either failed to enact, or failed to enforce, policies that appropriately safeguard patient PHI. (Pl.'s Br. at ECF pp. 3, 13) ("Defendants' press releases create a cognizable threat of harm to Indiana residents *in revealing that Defendants' policies do not reasonably protect their patient's privacy interests* in their identifiable health information.")

(emphasis added). The Court is skeptical that the absence of PHI policies, or enactment of deficient ones, can be inferred from IUH's public response to one doctor's treatment of one patient on one occasion. For purposes of the motion, the Court assumes that IUH was incorrect, and Dr. Bernard violated HIPAA. However, from there, the State asks the Court to assume IUH has no PHI policies, or that the policies it does have are substantively deficient in safeguarding PHI. Surprisingly, the State provides no explanation of the policies it insists are deficient, or facts to demonstrate that no HIPAA-compliant policy exists at IUH. While the State need not list the substance of an alleged deficient policy to state a cause of action under HIPAA, it cannot demonstrate that its residents are *actively threatened* by a policy it makes no effort to describe. Moreover, void from the State's Complaint are any allegations that IUH's policies, or lack thereof, continue to suffer from the same deficiencies allegedly present in mid-2023.

The State's effort here is in contrast with a previous prosecution where the Indiana Attorney General, alongside the attorney generals of several other states, alleged that hackers stole the PHI of 3.9 million individuals, including Indiana residents. *Medical Informatics Engineering*, 3:18-CV-969 (N.D. Ind 2018). There, the States alleged that MIE, a defendant, had violated HIPAA safeguards. *Id*. In support of this claim, the States' complaint provided an excerpt from the Defendants' privacy policy, in effect at the time of breach, and detailed the deficiencies of the defendant's security policies—

> For example, the incident response plan provided by Defendants was incomplete. There are several questions posed in the document that indicate it is still in a coordination or draft stage. Indeed, there is no documented evidence or checklist to indicate that Defendants followed their own incident response plan. Finally, there is no documentation that Defendants conducted HIPAA Security and Awareness training for 2013, 2014, or 2015, prior to the breach.

*Medical Informatics Engineering*, 3:18-CV-969 (N.D. Ind 2018). By nature, to be "threatened" within the meaning of HITECH, residents' privacy interests must be actively jeopardized by the

defendant's conduct. *Pennsylvania*, 262 U.S. at 592 ("Their [residents] health, comfort and welfare are *seriously jeopardized by the threatened withdrawal* of the gas from the interstate stream.") (emphasis added). Conclusory allegations do not make out a threat to residents' privacy interests. Specific facts describing defendant's conduct and *how* it threatens residents' privacy interests do. Here, where the Court would reasonably anticipate factual allegations as to IUH's *conduct*, the State has filled in the gaps with conclusory statements. (Pl.'s Br. at ECF p. 10) ("Defendants' policies, or lack thereof, do not protect against the reasonably anticipated threats to the privacy interests provided to all of their patients, most of whom are Indiana residents"); *cf. Kansas,* 185 U.S. at 134 ("Colorado is threatening to build, and will build unless restrained, other similar canals, with the intention of diverting other large quantities of water from the river . . . and the legislature of that state has authorized their construction.").

Broad conclusions that IUH has violated HIPAA are patently insufficient. (Compl. at ECF p. 19) ("By publicly ratifying Dr. Bernard's misconduct, IUH has revealed a systemic flaw in its implementation and administration of HIPAA rules that affect the privacy of all its patients."). The Court will not stretch the facts to fit the theory advanced by the State. Here, there are no factual allegations from which the Court can reasonably infer that IUH's policies, or lack thereof, have created an identifiable *impending* or *ongoing* threat to Indiana residents' privacy interests.

### c. Failure to Train

Lastly, the Court turns to the State's argument that by failing to properly train its workforce on federal and state privacy laws, IUH has "threatened" the privacy interests of Indiana patients. According to the State, IUH has either failed to train its workforce on the necessity of obtaining patients' written authorization before disclosing PHI, or, by publicly stating that Dr. Bernard did not violate HIPAA, IUH undermined that training. Regarding the

former theory, the State has provided no facts from which the Court can reasonably infer that IUH has failed to train its workforce on obtaining patient written consent prior to disclosing PHI. Ordinarily, where a plaintiff raises a failure to train claim, there are accompanying allegations to substantiate that alleged failure. *See Medical Informatics Engineering*, 3:18-Cv-969 (N.D. Ind 2018) ("Finally, there is no documentation that Defendants conducted HIPAA Security and Awareness training for 2013, 2014, or 2015, prior to the breach."). Here, the State's allegations are limited in scope to one physician's alleged failure to obtain a patient's written authorization before disclosing her patient's PHI. Even if the State's allegations are proven true, a physician's failure to obtain written consent on one occasion does not indicate that IUH has categorically failed to train its 36,000-member workforce.

Alternatively, the State argues that IUH's press releases, which disagreed with the outcome of the Licensing Board's investigation, undermine any previous training its workforce received. The State argues that IUH's press releases "ratif[ied[ and condon[ed] Dr. Bernard's conduct which resulted in violations of patient privacy, leading any one of their over 35,000+ team members, including Dr. Bernard, to reasonably believe that they too can disclose personal health information of patients . . . to reporters without patient authorization and without consequence." (Pl.'s Br. at ECF p. 11). Again, to construct a threat against Indiana residents' privacy interests, the State relies on speculative theories and assumptions in substitution of facts. The Court is not required to make assumptions about how IUH's conduct *might* impact Indiana residents. It is the State's obligation, at the outset, to demonstrate that Indiana residents' privacy interests *are* threatened by IUH's conduct. The State's Complaint simply does not delineate what affect IUH's public statements have had on IUH's workforce and its compliance with or understanding of HIPAA. Layers of contingencies separate the State's complaint from plaintiff-

state's complaints in previous Supreme Court cases where residents' interests are "threatened." Because the State has failed to allege that at least one Indiana residents' privacy interests have been or are "threatened or adversely affected" by IUH's alleged violations of HIPAA, the State has failed to properly invoke its *parens patriae* authority. § 1320-d(5).

### B. State Law Claims

In addition to its federal claims, the State has brought claims under Indiana's Deceptive Consumer Sales Act ("DCSA"). If the State's HIPAA claims are dismissed, IUH asserts that the Court should also relinquish supplemental jurisdiction over the State's DCSA claim. The Court agrees.

When all accompanying federal claims are discarded, district courts have "broad discretion to decide whether to keep the case or relinquish supplemental jurisdiction over the state-law claims." *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc*., 672 F.3d 476, 478 (7th Cir. 2012); *see also Kennedy v. Schoenberg, Fisher & Newman, Ltd*., 140 F.3d 716, 728 (7th Cir. 1998) (describing a district court's decision to relinquish supplemental jurisdiction as "almost unreviewable."). Although labeled as a discretionary decision, there is a presumption that the court will relinquish their federal jurisdiction in these situations. *Al's Serv. Ctr. v. BP Prods. N. Am., Inc*., 599 F.3d 720, 727 (7th Cir. 2010). While this presumption is rebuttable, "it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Khan v. State Oil Co*., 93 F.3d 1358, 1366 (7th Cir.1996).

The Seventh Circuit has identified three areas where the presumption might be displaced: (1) where the statute of limitations has run on the pendant claim, (2) where substantial judicial resources have already been applied, causing a substantial duplication of effort in another court,

or (3) where it's clear how pendant claims can be decided. *RWJ Mgmt. Co.*, 672 F.3d at 480.

None of these situations are present here. The Court has no reason to believe that statute of

limitations would present a barrier for the State in refiling its Indiana claims. Moreover, the

Court has not expended substantial judicial resources on this case, and it is not "absolutely clear"

how the State's DCSA claim should be decided. *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578

F.3d 505, 515 (7th Cir. 2009). Consequently, out of respect for Indiana's interests in applying its

own law, the Court relinquishes its supplemental jurisdiction over the State's DCSA claim.

*Huffman v. Hains*, 865 F.2d 920, 923 (7th Cir. 1989) ("[R]espect for the state's interest in

applying its own law, along with the state court's greater expertise in applying state law, become

paramount concerns.").

## IV.    Conclusion

In sum, IUH's Motion to Dismiss, (Docket No. 16), is **GRANTED in full**. The State has

until **July 22, 2024**, to file an Amended Complaint. *See Runnion ex rel. Runnion v. Girl Scouts of*

*Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, however, a

plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at

least one opportunity to try to amend her complaint before the entire action is dismissed."). **If the**

**State fails to file Amended Complaint by July 22, 2024, the Court will dismiss the case**

**without further warning.**

SO ORDERED.

Dated:  June 21, 2024

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana

25

Served electronically on all ECF-registered counsel of record.